SETH, Circuit Judge.
 

 This appeal involves various charges arising out of the representation of Gary and Marcee Levine by the law firm of Zimmerman & Schwartz. The grand jury returned a 50 count indictment charging the Levines, the law firm, certain members of the law firm, and other participants of conspiring to defraud the United States by concealing the financial transactions of the Levines. Appellant, who was an associate with the law firm, was named in 18 of the counts. In a joint trial with Steven Zimmerman, one of the senior partners of the law firm, appellant was convicted of four counts, conspiracy in violation of 18 U.S.C. § 371, two counts of bankruptcy fraud in violation of 18 U.S.C. §§ 2 and 152, and mail fraud in violation of 18 U.S.C. §§ 2 and 1341. On appeal, he challenges the sufficiency of the evidence as to each of those counts as well as various rulings by the trial court. For the reasons that follow, we reverse the trial court and remand for a new trial.
 

 STATEMENT OF FACTS
 

 Due to the complex nature of the transactions, we limit our discussion of the facts to those relevant to this appellant and incorporate by reference the statement of facts in
 
 United States v. Zimmerman,
 
 943 F.2d 1204. Viewing the evidence in the light most favorable to the government, the following events occurred in relation to this appeal.
 

 Gary and Marcee Levine operated a retail furniture store known as Levines Home Furnishings in Denver. The store’s corporate name was Sofa Gallery, Inc. In 1985, they sought advice from David Schwartz, of Zimmerman & Schwartz, regarding payment of creditors and filing bankruptcy.
 

 Based upon the advice of Schwartz, the Levines hired Sales Results and its principal, Stanley Lansing, to conduct a liquidation sale. Lansing and Sales Results were to receive 10% of the gross retail revenues and the net proceeds were to be paid to the Levines’ creditors. Cherry Creek National Bank and Westinghouse Credit Corporation, two of Sofa Gallery’s principal creditors, agreed to the sale. They released their secured interests in the unsold inventory and financed the acquisition of over two million dollars additional inventory for the sale.
 

 During this time, the Levines and Lansing entered into an undisclosed kickback agreement whereby Lansing agreed to pay Marcee Levine one-third of his 10% commission. Upon the advice of Schwartz, Gary Levine received none of this money because of his impending bankruptcy.
 

 The liquidation sale was conducted from July through December 1985. The sale resulted in a reported loss, with no proceeds paid to the creditors except for 0. Wesley Box and the Rocky Mountain News. During the course of the sale, how
 
 *1249
 
 ever, Marcee Levine received an undisclosed kickback of approximately $100,000 from Sales Results. This payment along with $150,000 from pre-liquidation sale accounts receivable was deposited in the law firm trust account for the Levines’ personal use. No evidence was introduced that any of these financial transactions appeared in the law firm’s ledger.
 

 In 1985, Schwartz delegated two tasks relevant to the Levine transactions to appellant. Schwartz requested that appellant draft a quitclaim deed granting Gary Levine’s interest in the house to Marcee Levine and draw up the Articles of Incorporation for a business known as Action Sales Group, Inc. for Stephen Forsey.
 

 On February 19, 1986, Schwartz asked appellant to attend a meeting at the Marriott to take notes. During this meeting, Schwartz proposed that the Levines use money from the Sofa Gallery’s employee pension plan to capitalize Action Sales Group, Inc. At trial, appellant testified that he stated at the meeting that this would be an improper use of pension funds and refused to draft the documents. For-sey, however, testified that appellant did not object to the use of the funds.
 

 Thereafter, the Levines withdrew $425,-000 from the pension plan and gave $300,-000 to Forsey to fund Action Sales Group, Inc. The Levines put the other $125,000 in a secret trust account at the accounting firm of William C. Schlapman, P.C. This money was supplemented by corporate tax refunds and used for the Levines’ personal use. In addition, the Levines and Schlap-man entered into a plan to delay filing amended tax returns.
 

 On April 17, 1986, Schwartz drafted a letter to the Levines stating that “Tom Brown has been fully briefed on all aspects of all of our transactions and is fully cognizant of all the problem areas in the event that there is any problem with either the new business or with the old negotiations.” Supp. Vol. XXIII at 88-89.
 

 On May 20, 1986, D. Bruce Coles, an attorney representing Colorado National Leasing, deposed Gary Levine. During his deposition, Gary Levine failed to disclose any of the trust accounts or interest in Action Sales Group, Inc. Although Schwartz attended the deposition with Gary Levine, the evidence showed that appellant met with Gary Levine prior to the deposition and met with Schwartz after-wards. Gary Levine subsequently filed for bankruptcy on September 26, 1986.
 

 Schwartz continued his representation of the Levines until 1987 when he turned the Levine file over to appellant. On January 29,1987, appellant met with Gary Levine to discuss his deposition concerning the bankruptcy proceedings. The following day, he attended the deposition with Gary Levine. Those present at the deposition were appellant, Gary Levine, Coles, and H. Christopher Clark, the bankruptcy trustee. They discussed the use of the employee pension plan funds to capitalize Action Sales Group, Inc.; however, Gary Levine denied any ownership or stock interest in Action Sales Group, Inc. He also failed to disclose either the law firm trust account or the Schlapman trust account.
 

 After the liquidation sale, the Levines put their financial records in a storage locker. During the bankruptcy proceedings, they allowed numerous inspections of the records contained in the storage locker. In 1986, Cherry Creek National Bank reviewed, inspected and removed 20-25 boxes of documents. At his deposition in January 1987, Gary Levine agreed to turn over his storage locker key to the trustee. In March 1987, appellant wrote to the trustee and offered him the opportunity to inspect the records for the creditors.
 

 On April 14, 1987, a creditors’ meeting was held where Coles expressed his dissatisfaction with discovery. In an attempt to obtain more information about the Levines’ assets, Coles made several discovery requests. On May 19, 1987, the bankruptcy court issued an order for Marcee Levine to appear at a deposition on June 9, 1987, and produce copies of all financial bookkeeping or accounting records and related documents.
 

 During this time, Gary Levine told appellant that he did not want to pay rent on the storage locker and was going to destroy
 
 *1250
 
 the remaining records. On May 23, 1987, appellant reviewed the records, determined that they were of no value to the bankruptcy proceedings and destroyed them at a landfill site.
 

 On May 27,1987, appellant wrote a letter to Coles advising him that he had filed a motion with the court to vacate the order authorizing the examination and that the court would not be able to act before the June 9 deposition date. Thereafter, Mar-cee Levine was served with two subpoenas dated June 2 and June 15, 1987.
 

 Without the court ruling on appellant’s motion, Marcee Levine was deposed on June 18, 1987. Marcee Levine, through appellant, did not produce all of the documents requested by Coles, asserting attorney-client privilege. Thereafter, appellant filed a motion for a protective order of the records until the court could make a determination of this issue. Coles did not oppose this motion because appellant subsequently agreed to supply Coles with the records he had requested.
 

 During the course of the bankruptcy proceedings, the bankruptcy trustee requested information concerning the Levines’ 1986 tax return. In response to these requests, appellant drafted a letter dated February 10, 1988 stating that:
 

 “The reason for the delay has been that the accountant wants a wealth of information and documents which the Levines have not entirely been able to locate. Many of their financial records were in the storage locker and seem to have disappeared into the hands of the numerous attorneys and banks who were interested in those documents.”
 

 SUFFICIENCY OF THE EVIDENCE
 

 Appellant challenges the sufficiency of the evidence to sustain his conviction on all four counts. We address each of these counts in turn. In reviewing a sufficiency of the evidence claim, we “view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt.”
 
 United States v. Sullivan,
 
 919 F.2d 1403, 1431 (10th Cir.1990).
 

 Count 1
 

 Count 1 charged appellant with conspiracy to defraud the United States under 18 U.S.C. § 371. Under this statute, the government was required to establish beyond a reasonable doubt that: (1) there was an agreement between two or more people, (2) to defraud the United States and (3) an overt act was committed by one of the conspirators in furtherance of that agreement.
 
 See United States v. Schmick,
 
 904 F.2d 936, 941 (5th Cir.1990). The defendant need not have knowledge of all the details or all the members of the conspiracy,
 
 United States v. Savaiano,
 
 843 F.2d 1280, 1294 (10th Cir.1988), and the jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy.
 
 United States v. Tranakos,
 
 911 F.2d 1422, 1430 (10th Cir.1990). “ ‘ “The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt.” ’ ”
 
 Id.
 
 (quoting
 
 Savaiano,
 
 843 F.2d at 1294) (quoting
 
 United States v. Batimana,
 
 623 F.2d 1366, 1368 (9th Cir.1980)). However, “ ‘caution must be taken that the conviction not be obtained “by piling inference upon inference.” ’ ”
 
 United States v. Fox,
 
 902 F.2d 1508, 1513 (10th Cir.1990) (quoting
 
 United States v. Butler,
 
 494 F.2d 1246, 1252 (10th Cir.1974)) (quoting
 
 Direct Sales Co. v. United States,
 
 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)).
 

 Appellant claims that the evidence was insufficient to support his conviction because he was not a knowing participant in the conspiracy. Specifically, he claims that the government’s case was built on inferences involving his role as attorney for the Levines. He argues that any task performed by him in relation to the bankruptcy proceedings could not constitute an overt act in furtherance of the conspiracy
 
 *1251
 
 to defraud the United States without his knowing participation.
 

 We agree with appellant's argument that the government’s case centers around his role as the Levines’ attorney. While there is little direct evidence of appellant’s involvement, we must conclude that there was sufficient circumstantial evidence for a jury to have found beyond a reasonable doubt that appellant knowingly and actively participated in the conspiracy to defraud the United States.
 

 Viewing the evidence in the light most favorable to the government, a reasonable jury could infer that appellant was aware of the misuse of Sofa Gallery’s employee pension plan funds, the Levines’ interest in Action Sales Group, Inc., the misuse of the law firm trust account to hide the proceeds from the liquidation sale and the Schlap-man trust account from the following evidence presented at trial.
 

 The evidence showed that appellant began working on the Levine bankruptcy case in 1985. His involvement in the Levine case gradually increased in 1986 when he attended a meeting at the Marriott with Schwartz, Forsey, and the Levines. During this meeting, it was suggested that Gary Levine use the Sofa Gallery’s employee pension plan funds to capitalize Action Sales Group, Inc. Although appellant denies that he acquiesced to the use of those funds in that manner, Forsey testified that appellant did not object. Further, Forsey’s testimony was corroborated by the letter dated April 17, 1986, which stated that appellant had been fully briefed on all aspects of the Levine transactions.
 

 In addition to the letter drafted by Schwartz concerning appellant’s knowledge of the Levine transactions, a reasonable jury could possibly infer that Schwartz “prepped” appellant on the Levine financial transactions when he turned the file over to him in 1987. Appellant’s knowledge of Gary Levine’s assets during the bankruptcy proceedings would be crucial to effective representation given the existing conspiracy to conceal a number of Gary Levine’s assets.
 

 Further, appellant met with Gary Levine to discuss his assets and go over “ground rules” for his deposition. Appellant also discussed Gary Levine’s assets with Schlap-man. A reasonable jury could infer that appellant was aware of Gary Levine’s undisclosed assets from these discussions.
 

 While we have previously held that knowledge or mere association is insufficient to convict on a charge of conspiracy,
 
 Fox,
 
 902 F.2d at 1514, we believe that appellant’s actions constitute more than mere knowledge given the following events and the inferences which may be derived therefrom.
 

 During his first deposition, Gary Levine failed to disclose any information regarding his interest in Action Sales Group, Inc., the law firm trust account or the Schlap-man trust account. While appellant did not attend this deposition, he did meet with Gary Levine prior to the deposition to discuss “ground rules.”
 

 Appellant represented Gary Levine at his second deposition which took place on January 30, 1987. Again, Gary Levine failed to disclose any of the trust accounts. While they discussed the embezzlement scheme of the employee pension plan to fund Action Sales Group, Inc., Gary Levine denied any ownership or stock interest in the company. From this evidence, a reasonable jury could infer that appellant discussed Gary Levine’s assets with him and how to conceal them during the deposition. They could further conclude that appellant was aware of the conspiracy to conceal Gary Levine’s assets and actively participated in the conspiracy by failing to reveal the undisclosed assets to the bankruptcy trustee.
 

 Lastly, the jury heard testimony concerning appellant’s destruction of business records contained in the Levines’ storage locker. A reasonable jury could conclude that appellant’s destruction of records relating to the Levines’ bankruptcy proceedings was probative of his involvement in the conspiracy and could infer from his actions that he actively participated in the conspiracy to defraud the United States.
 

 Given the evidence presented and the reasonable inferences therefrom, a jury
 
 *1252
 
 could have found beyond a reasonable doubt that appellant was aware of all of the Levines’ financial transactions; that he agreed to defraud the United States by concealing their financial transactions; and that he aided the conspiracy in its objectives in violation of 18 U.S.C. § 371.
 

 Count 44
 

 Count 44 charged appellant with “knowingly, fraudulently, and unlawfully” concealing the assets and property of Gary Levine from D. Bruce Coles during the bankruptcy proceedings of Gary Levine on January 30, 1987, in violation of 18 U.S.C. §§ 2 and 152. The indictment specifically alleged that appellant failed to disclose Gary Levine’s interest in Action Sales Group, Inc. and the proceeds derived therefrom, as well as the law firm and Schlapman trust accounts.
 

 Appellant claims that the evidence was insufficient because there was no direct evidence that appellant knew about the law firm trust account or the Schlapman trust account; therefore, he could not have counseled, aided and abetted Gary Levine during the deposition as to the concealment of those accounts. He further contends that Coles was fully aware of the employee pension plan scheme because it was discussed during Gary Levine’s deposition on January 30, 1987.
 

 After carefully reviewing the evidence in the light most favorable to the government, we conclude that a jury could have found beyond a reasonable doubt that appellant committed bankruptcy fraud in violation of 18 U.S.C. § 152 for substantially the same reasons as discussed above.
 

 From the evidence, a reasonable jury could infer that appellant was aware of all of the Levines’ undisclosed assets; that appellant aided Gary Levine in the concealment of those assets; and that appellant failed to disclose the existence of those assets during the proceedings of January 30, 1987. We believe that the evidence presented was sufficient.
 

 Count 46
 

 Count 46 charged appellant with “knowingly and fraudulently” destroying, mutilating, and concealing the corporate accounting records of the Sofa Gallery and Gary and Marcee Levine after Gary Levine had filed bankruptcy in violation of 18 U.S.C. §§ 2 and 152.
 

 Appellant claims that the evidence was insufficient to convict him of destroying the records because he complied with all of the discovery demands. Further, he claims that all of the records necessary to reconstruct the beginning inventory of the liquidation sale and the proceeds from that sale were contained in the government’s document room and produced at trial.
 

 Although we agree with appellant that he was very accommodating in permitting the inspection of the records contained in the storage locker, the timing of the destruction in relation to the following events is suspect.
 

 At the time appellant destroyed the records, Gary Levine’s bankruptcy schedules had been filed and his case was pending; therefore, no records relating to his financial transactions should have been destroyed. While the two subpoenas were not issued until after the records had been destroyed, appellant had received the May 19 order requesting that Marcee Levine produce records relating to her bankruptcy proceedings. He also knew that Coles was dissatisfied with discovery. Given this information, he should have given Coles or any other interested creditor the opportunity to review the records prior to destroying them.
 

 While appellant claims that the records destroyed were insignificant and that all of the records necessary to reconstruct the beginning inventory and results of the liquidation sale were produced at trial, without benefit of viewing those records, we cannot reach that same conclusion.
 

 Viewing the evidence in the light most favorable to the government and the reasonable inferences therefrom, the evidence presented established that the Levines stored records relating to their financial transactions in the storage locker; that
 
 *1253
 
 Gary Levine had filed bankruptcy; and that appellant destroyed these records. A jury could have found beyond a reasonable doubt that appellant committed bankruptcy fraud in violation of 18 U.S.C. § 152.
 

 Count Jf9
 

 Count 49 charged appellant with mail fraud under 18 U.S.C. §§ 2 and 1341. The thrust of this count was that appellant falsely responded to a request by the bankruptcy trustee for information concerning the filing of the Levines’ 1986 tax returns in a letter sent through the United States mail. The government asserts that he responded falsely because the actual filing of the 1986 tax return would have revealed that the Levines received proceeds from Action Sales Group, Inc.
 

 In order to obtain a conviction under 18 U.S.C. § 134, the government was required to establish the existence of two elements: “(1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises; and (2) use of the United States mails for the purpose of executing the scheme.”
 
 United States v. Cardall,
 
 885 F.2d 656, 679 (10th Cir.1989).
 

 Appellant claims that the evidence was insufficient to prove that he was involved in any scheme to conceal Gary Levine’s assets or delay the filing of the Levines’ taxes at the time he sent the letter to the bankruptcy trustee because all of the documents concerning Action Sales Group, Inc. had been disclosed and the bankruptcy trustee was aware of the employee pension plan scheme.
 

 While appellant correctly argues that the bankruptcy trustee was aware of the misuse of the employee pension plan funds, there is no evidence indicating that he was aware of Gary Levine’s ownership interest in Action Sales Group, Inc. At his deposition, Gary Levine denied any ownership or stock interest in Action Sales Group, Inc. He also failed to disclose the proceeds he received from this venture in his bankruptcy schedules. Further evidence of this scheme is apparent from the fact that when the Levines actually filed their tax return, they failed to report the proceeds from Action Sales Group, Inc. as income.
 

 Although appellant disclosed part of the Action Sales Group, Inc. agreement to Coles in July 1987, Coles did not receive a complete copy of the agreement until the fall of 1988, several months after the letter was sent to the bankruptcy trustee. In addition, a reasonable jury could possibly infer that appellant’s letter to the bankruptcy trustee was not entirely accurate given appellant’s destruction of some of the Levines’ financial records.
 

 Therefore, at the time the letter was sent, a reasonable jury could conclude that the bankruptcy trustee was unaware of Gary Levine’s interest in Action Sales Group, Inc. In an effort to conceal this information from the bankruptcy trustee and perpetuate the scheme to delay the filing of the Levines’ 1986 tax return, appellant represented to him that not all of the records to complete the tax return were available. Based upon this evidence, a jury could have found beyond a reasonable doubt that appellant committed mail fraud in violation of 18 U.S.C. §§ 2 and 1341.
 

 CO-CONSPIRATOR STATEMENTS
 

 Appellant challenges the admission of co-conspirator hearsay statements under Fed.R.Evid. 801(d)(2)(E). He argues that he was not a member of the conspiracy when those particular statements were made. He further claims that the trial court placed an imprimatur on the evidence.
 

 The government began its presentation of the evidence in chronological order by establishing the underlying basis of the conspiracy. It presented evidence of the kickback agreement, the misuse of the law firm trust account to hide the proceeds received from the liquidation sale, the Schlapman trust account, the collection of Sofa Gallery’s accounts receivable, and a plan to delay the filing of the Levines’ corporate income tax return.
 

 Through two government witnesses, the trial court admitted the hearsay statements of the Levines and Schwartz which were
 
 *1254
 
 allegedly made prior to appellant’s involvement in the conspiracy. Appellant objected to their admissibility because it had not been established that he was a member of the conspiracy when the statements were made. The trial court overruled his objection but agreed to his request for a limiting instruction. The trial court gave the following limiting instruction:
 

 “THE COURT: Please be seated. Members of the jury, I am going to give you a limiting instruction at this time. I want to explain to you that we deal with evidence based upon what is known as the Federal Rules of Evidence.
 

 “And Rule 104(b) states that when the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon or subject to the introduction of evidence sufficient to support a finding of the fulfillment of the condition.
 

 “Now what that means in here in terms of the exhibits that are to be admitted in the government’s case-in-chief is this: Each of the exhibits that will be offered and those which may be admitted by the Court are going to be admitted conditionally, and that condition is that the government prove otherwise the existence of the conspiracy alleged.
 

 “So that as these exhibits are received into evidence during the course of the government’s case-in-chief, bear in mind that until and unless the Court otherwise admits them unconditionally, they are not admitted to establish the existence of the conspiracy, rather the conspiracy will have to be established otherwise.”
 

 Appellant did not object to this instruction. Thereafter, the trial court expressed its concern that if the hearsay statements were subsequently admitted, this would convey to the jury that the trial court believed that the government had established the existence of a conspiracy.
 

 Although appellant had not requested a
 
 James
 
 hearing, the trial court held a hearing to determine the admissibility of the statements. It concluded that the evidence was sufficient to show that a conspiracy existed and that appellant was a member of that conspiracy. Appellant renewed his objection that the statements were inadmissible against him because he was not a member of the conspiracy when the statements were made. The trial court overruled appellant’s objection, stating that “[o]nce a conspiracy is proven and once a person is hooked up to the conspiracy, even though it’s at the tail end, the admission of co-conspirator statements at the front end are admissible against all the co-conspirators.” Supp. Vol. VII at 16.
 

 Rather than address the issue of the conditionally admitted statements, the trial court admitted them unconditionally, without further instruction to the jury. Appellant did not object to the trial court’s resolution of this issue.
 

 We first address appellant’s claim that the trial court erred in admitting the hearsay statements of the co-conspirators which were made before it was established that he was a member of the conspiracy. In
 
 United States v. Mobile Materials, Inc.,
 
 881 F.2d 866 (10th Cir.1989), we said:
 

 “[A] trial court may admit statements of co-conspirators under Fed.R.Evid. 801(d)(2) after finding, by a preponderance of the evidence, that: 1) a conspiracy existed, 2) the declarant and the defendant against whom the declarations are offered were members of the conspiracy, and 3) the statements were made in the course of and in furtherance of the conspiracy.”
 

 Id.
 
 at 869. In making this determination, the trial court may consider independent evidence as well as the hearsay statements themselves.
 
 Id.
 
 (citing
 
 Bourjaily v. United States,
 
 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987)). The determination of whether to admit such hearsay evidence is within the discretion of the trial court,
 
 Mobile Materials,
 
 881 F.2d at 869, and will not be reversed absent an abuse of discretion.
 
 United States v. Wolf,
 
 839 F.2d 1387, 1393 (10th Cir.1988).
 

 Such an abuse of discretion did not occur in this instance. In its case, the government presented the hearsay statements of the Levines and Schwartz primarily through the testimony of two government
 
 *1255
 
 witnesses. The evidence, as a whole, established that a conspiracy existed; that the Levines, Schwartz and appellant were members of that conspiracy; and that the statements of the Levines and Schwartz were made during the course and in furtherance of the conspiracy.
 

 Appellant contends that for these statements to be admissible, the government was required to prove that he was a member of the conspiracy at the time the statements were made. In support of his argument, he directs us to
 
 United States v. Andrews,
 
 585 F.2d 961 (10th Cir.1978). In
 
 Andrews,
 
 we stated that “if it is more likely than not that a declarant and cocon-spirator were members of a conspiracy when hearsay statements were made and the statements were in furtherance of a conspiracy, that hearsay is admissible.”
 
 Id.
 
 at 965 (citing
 
 United States v. Petrozziello,
 
 548 F.2d 20 (1st Cir.1977)). This statement, as set out in
 
 Andrews,
 
 is not dispositive of the issue raised by appellant. Whether the defendant would have to be a member of the conspiracy at the time the statements were made for the co-conspirator statements to be admissible was not there an issue. Further, the
 
 Petrozziello
 
 case which
 
 Andrews
 
 relied on was clarified and substantially limited in
 
 United States v. Baines,
 
 812 F.2d 41, 42 (1st Cir.1987).
 

 The prevailing view among the circuits is that previous statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy.
 
 See United States v. Murphy,
 
 852 F.2d 1 (1st Cir.1988);
 
 United States v. Badalamenti,
 
 794 F.2d 821 (2d Cir.1986);
 
 United States v. Osgood,
 
 794 F.2d 1087 (5th Cir.1986);
 
 United States v. Balistrieri,
 
 778 F.2d 1226 (7th Cir.1985);
 
 United States v. Jackson,
 
 757 F.2d 1486 (4th Cir.1985);
 
 United States v. Leroux,
 
 738 F.2d 943 (8th Cir.1984);
 
 United States v. Jannotti,
 
 729 F.2d 213 (3d Cir.1984);
 
 United States v. Tombrello,
 
 666 F.2d 485 (11th Cir.1982);
 
 United States v. Anderson,
 
 532 F.2d 1218 (9th Cir.1976). We join in that holding. The fact that appellant may have joined the conspiracy after its inception does not make his co-conspirators’ previous statements inadmissible. Therefore, the hearsay statements were properly admitted.
 

 We next address appellant’s claim that the trial court placed an imprimatur on the evidence. Appellant argues that any reasonably attentive jury could have inferred from the trial court’s subsequent admission of these co-conspirator statements that it believed that a conspiracy existed. Because he failed to object to the trial court’s resolution of this issue, we review for plain error.
 
 United States v. Lonedog,
 
 929 F.2d 568, 570 (10th Cir.1991).
 

 We cannot say that this constituted plain error. The hearsay statements admitted prior to the
 
 James
 
 hearing did not implicate appellant in any way. They were merely introduced as background information concerning the commencement and overall objectives of the conspiracy.
 

 Further, appellant does not dispute the fact that a conspiracy existed. He only disputes his involvement in it. Even if we accepted appellant’s argument, the most that a reasonable jury could infer is that the trial court believed that a conspiracy existed. The trial court did not comment on appellant’s involvement in the conspiracy or convey to the jury that it believed appellant was a member of the conspiracy. The jury was still required to determine beyond a reasonable doubt that appellant was a knowing and active member of that conspiracy.
 

 Lastly, the trial court instructed the jury that “you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case.” Supp. Yol. XIV at 7-8. A fundamental premise of our judicial system is that the jury can and will follow the instructions given by the trial court.
 
 Cardall,
 
 885 F.2d at 668 (citing
 
 Parker v. Randolph,
 
 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979)). Absent evidence to the contrary, we must conclude that the jury followed the instructions provided by the trial court.
 

 BANKRUPTCY OPINIONS
 

 During the government’s case in chief, the trial court allowed the govern
 
 *1256
 
 ment to introduce the statements of two bankruptcy judges made in earlier proceedings involving the same bankruptcy. Both statements contained conclusions by the judges regarding the law firm’s possible involvement in the same conspiracy here charged. No basis for the conclusions was offered. Appellant challenges their admission on the basis that they constituted hearsay and were so prejudicial as to constitute reversible error.
 

 The argument presented by appellant essentially duplicates that made by the defendant in the companion case,
 
 United States v. Zimmerman,
 
 943 F.2d 1204, 1210-1213 (10th Cir. Aug. 28, 1991). The only difference is that this appellant was actually mentioned by name in one of the statements. For substantially the same reasons as articulated in
 
 Zimmerman,
 
 we conclude that the trial court abused its discretion in admitting the statements and conclusions made by the two judges about the same issues as in the case being tried. Their admission constituted reversible error.
 

 The admission of the conclusions of the two bankruptcy judges as to the basic issue of the trial of appellants Zimmerman and Brown was exactly the same as having the judges appear as expert witnesses — experts who gave their opinions and conclusions as to the matters the jury properly was to decide. We can see no difference in using the judges’ statements and having them make the statements as witnesses at the trial.
 

 QUESTIONS PRESENTED TO THE COURT BY THE JURY
 

 On the third day of deliberations, the jury sent a note to the trial court containing three questions. The questions were direct, well written and clearly described the jury’s problem. The jury’s inquiry stated:
 

 “If a person observes an act that is obviously, to him or her, a crime, (1) does the observer have a legal responsibility to report the crime; (2) does the observer have a legal responsibility to intervene to stop it; (3) does failure to report or otherwise intervene make the observer a participant or in any way responsible?”
 

 A conference was held to determine what the trial court’s response should be. After some discussion, the trial court indicated that the jury’s questions went to the “heart of the conspiracy concept” and that the jury instructions as a whole adequately addressed the questions posed. Supp. Vol. XVI. Appellant stated that in the absence of his tendered instruction on mere knowledge and association, rejected by the trial court, the trial court should refer the jury to instruction No. 5 with respect to defining the act of conspiracy and intent, and instruction No. 6 with respect to specific intent. The trial court rejected such a specific instruction stating that by referring them to the instructions as a whole, the jury would necessarily be referred to instructions Nos. 5 and 6.
 

 Appellant challenges the trial court's instructions to the jury claiming that his tendered instructions would have remedied the jury’s confusion. We have reviewed appellant’s proposed instructions and find that they were similar to those given by the trial court. Further, we find that they did not specifically answer the jury’s questions regarding appellant’s duty to report a crime.
 

 Although we find appellant’s argument unpersuasive, some additional instruction was required. Because appellant has not raised the issue of an additional instruction before this court, we raise our own motion and review for plain error.
 
 See United States v. Kline,
 
 922 F.2d 610, 613 (10th Cir.1990).
 

 We addressed this issue in
 
 Zimmerman,
 
 943 F.2d at 1213-1214, and for essentially the same reasons expressed therein, we conclude that the jury may have been confused and convicted appellant on an improper basis. It was plain error not to resolve or attempt to resolve the jury’s confusion.
 

 GRAND JURY ABUSE
 

 Appellant challenges the government’s presentation of evidence to the grand jury. He claims that the govern
 
 *1257
 
 ment presented misleading and untruthful statements to the grand jury regarding his involvement with the other co-conspirators which interfered with the grand jury’s independence and his right to fundamental fairness throughout the criminal process. Specifically, appellant focuses on testimony stating that he destroyed Sofa Gallery records; testimony that Judge Matheson found that he violated the law; and testimony that he agreed to the proposal to fund Action Sales Group, Inc. with the employee pension plan.
 

 The trial court denied appellant’s motion to dismiss the case for grand jury abuse.
 
 United States v. Law Firm of Zimmerman & Schwartz, P.C.,
 
 738 F.Supp. 407 (D.Colo.1990). It found that appellant’s challenge to the government’s evidence “boil[ed] down to a challenge to the weight and credibility of the evidence presented to the grand jury.”
 
 Id.
 
 at 411. The trial court rejected appellant’s argument that exculpatory evidence was excluded from the grand jury, citing to appellant’s narrative testimony before the grand jury and the admission of two extensive letters outlining his defenses and theory.
 
 Id.
 

 We review the trial court’s factual determinations under the deferential clearly erroneous standard.
 
 United States v. Williams,
 
 899 F.2d 898, 900 (10th Cir.1990). The trial court’s ruling will only be reversed if we find errors in the indictment which prejudiced the defendant.
 
 Bank of Nova Scotia v. United States,
 
 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Such prejudice occurs if “there is some significant infringement on the grand jury’s ability to exercise independent judgment.”
 
 United States v. Pino,
 
 708 F.2d 523, 530 (10th Cir.1983).
 

 We agree with the trial court and find that the evidence presented by the government did not rise to the level of prejudice warranting a dismissal of the indictment. Appellant was allowed to present exculpatory material and was allowed to testify extensively on his own behalf. While the government’s witnesses may have provided testimony which was somewhat unreliable, “the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment.”
 
 Nova Scotia,
 
 487 U.S. at 261, 108 S.Ct. at 2377. Any prejudice which might have resulted from the government’s evidence was harmless.
 

 We have studied the remaining arguments made by appellant but conclude that we need not comment on them in view of our disposition of the case.
 

 IT IS ORDERED that the judgment is REVERSED by reason of the prejudicial errors and the case is REMANDED for a new trial.