UNITED STATES of America,
Plaintiff-Appellee,

v.

Marcee LEVINE and Gary Levine,
Defendants–Appellants.

Nos. 91–1082, 91–1096.

United States Court of Appeals,
Tenth Circuit.

July 2, 1992.

Stephen C. Peters, Asst. U.S. Atty. (Michael J. Norton, U.S. Atty., with him on the brief), Denver, Colo., for plaintiff-appellee.

Vicki Mandell–King, Asst. Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colo., for defendants-appellants.

Before McKAY and BRORBY, Circuit Judges, and VAN SICKLE,[*] District Judge.

BRORBY, Circuit Judge.

Gary and Marcee Levine, husband and wife, were tried jointly and convicted of numerous felony criminal charges. These charges stemmed from a multitude of acts committed by the Levines designed to defraud their creditors during the course of bankruptcy proceedings. Mr. Levine was convicted of eighteen counts and Mrs. Levine of seventeen. The Levines appeal asserting insufficiency of the evidence, evidentiary and sentencing errors. We affirm.

## OVERVIEW

Mr. and Mrs. Levine owned and operated a furniture business which was in some financial difficulty because the Levines had overstated the inventory by approximately $1.1 million. This fact is important because the secured lenders believed far more collateral existed than actually did, and the income from the business would have been overstated.

The secured creditors finally demanded a physical inventory, which uncovered the inventory shortage and prompted the Levines to liquidate the business. The secured creditors agreed to additional loans to purchase inventory to "feed" a liquidation sale. The Levines hired a liquidator to conduct the sale and he was to receive ten per cent of the gross sales as compensation for his services. As one of the largest secured creditors was a bank, all sale proceeds were to be deposited therein so this creditor could monitor the progress of the liquidation. The liquidation sale commenced August 1, 1985, and terminated approximately five months later at the end

---

[*] The Honorable Bruce M. Van Sickle, Senior District Judge for the District of North Dakota, sitting by designation.

of December when it was learned there was no money to pay creditors.

The Levines filed for Chapter 7 bankruptcy. Mr. Levine filed in September 1986. Mrs. Levine filed in February 1987. The Levines' debts were discharged in October 1987.

Thereafter diligent efforts of counsel for the creditors uncovered that the Levines, with the aid and assistance of their CPA, attorneys and various others, had hidden and transferred assets in order to defraud their creditors and had embezzled their employees' pension and profit plan assets. They accomplished this by many methods including transferring assets to associates and relatives, secretly diverting proceeds from accounts receivables, engaging in a hidden kickback scheme with the business liquidator, and maintaining secret undisclosed personal bank accounts. The Levines deposited much of the money hidden from the creditors into client trust accounts established by the Levines' attorneys and the Levines' CPA. These actions gave rise to the numerous criminal charges and convictions.

## I

### The Bankruptcy Fraud Convictions

Mr. Levine was convicted of four counts of bankruptcy fraud and Mrs. Levine was convicted of two counts, in violation of 18 U.S.C. § 152. This statute provides that "[w]hoever knowingly and fraudulently conceals from a ... trustee ... or from creditors ... any property belonging to the estate of a debtor" shall be guilty of the crime.

The facts underlying and supporting these six criminal convictions clearly reveal the Levines wilfully and intentionally engaged in conduct designed to conceal the existence of many significant assets from both their creditors and the bankruptcy trustee. One individual testified the Levines transferred their vehicles to him in order to conceal their existence from creditors. The evidence further showed the Levines continued to use these vehicles as if they owned them.

The trial evidence also revealed the Levines' attorneys established a secret trust fund for their benefit. Mrs. Levine entered into a kickback scheme with the liquidator whereby the Levines received three per cent of the gross proceeds from the liquidation sale. These funds were channeled through the secret trust account to the Levines. Once the creditors learned of this secret account, the Levines' CPA established yet another secret trust account. Approximately $180,000 was channeled through this second secret account for the Levines' benefit.

The record discloses the Levines formed another business entity, Action Sales Group, funded in part with monies embezzled from their employees' pension and profit sharing trust. Of the $487,000 embezzled from this trust, most found its way into the secret trust funds.

On appeal, the Levines do not deny taking these actions. They assert, however, they relied on their attorneys' advice, unaware that these actions were illegal. The Levines assert that determining what property belongs in the bankruptcy estate is often a complicated legal matter. They argue they were entitled to rely upon their attorneys' advice, which was that they no longer legally owned the property they were charged with concealing. To rephrase the Levines' argument, they contend the evidence is insufficient to establish they knowingly concealed these many assets as their attorneys had advised them they did not own that property.

Instruction 6 instructed the jury the acts had to be done "knowingly" and not because of mistake. Further, jury instruction 7 advised the jury that if a person acts strictly according to the attorney's advice "relying upon it and believing it to be correct, only intending his or her acts to be lawful," then that person cannot be convicted.

■ In reviewing the sufficiency of the evidence, this court must look at all the evidence, both direct and circumstantial, together with the reasonable inferences to be drawn therefrom in a light most favorable to the government to determine

whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Ratchford,* 942 F.2d 702, 703 (10th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1185, 117 L.Ed.2d 427 (1992).

■ An examination of Mr. Levine's testimony (Mrs. Levine did not testify) lends little support to their appellate argument. Mr. Levine testified his attorneys suggested "hiding" and "washing" funds in the attorneys' secret trust account so the creditors could be paid in full. Use of this terminology alone lends support to the jury's conclusion the Levines did not believe their attorneys' advice legal. Mr. Levine further testified the diverted monies were not used to pay creditors but instead were used to maintain a lavish life style. Mr. Levine testified that as his attorneys had prepared the transfer documents for various property, he assumed such action was lawful and proper. Mr. Levine's testimony continued to the effect that he honestly believed he did not own the property and his attorneys instructed him to deny ownership. It is simply incredible to assert that when Mr. Levine had the exclusive possession, use and control of property it was reasonable for him to believe he did not own the property.

The Levines' basic assumption is the jury is somehow bound to accept Mr. Levine's testimony as truthful. Such an assumption is unwarranted. The evidence established the Levines had ample reason to believe their attorneys' advice incorrect. The jury was entitled to make the choice and did. We conclude that more than ample evidence exists that would allow this or any other rational jury to conclude beyond a reasonable doubt the Levines knowingly and intentionally committed the criminal acts.

1. The pertinent portions of 18 U.S.C. § 1956(a)(1)(B)(i) read as follows:
   (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

## II

### Money Laundering

The jury convicted the Levines of six counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[1] This statute prohibits a person from unlawfully conducting or attempting to conduct financial transactions with the proceeds of specified unlawful activity.

Four of the six counts involved income tax refund checks, three from the federal government and one from the State of Colorado, being deposited in the CPA's hidden trust account and subsequently being converted surreptitiously to the Levines' personal use. The Levines do not challenge the remaining two counts which involved the use of the monies embezzled from the employees' pension and profit sharing trust.

The Levines contend their conviction for money laundering cannot stand because the tax refund monies were not the proceeds of illegal activity but rather the proceeds from their legitimate furniture business. They now challenge the indictment. Alternatively, they assert the evidence is insufficient to sustain these convictions.

### A. *The Indictment:*

The Levines contend the indictment failed to charge a crime as it failed to specify the disguised funds were from an unlawful source. In the trial court, Mrs. Levine challenged the indictment on similar grounds. *See United States v. Levine,* 750 F.Supp. 1433, 1442 (D.Colo.1990).

■ When we review an indictment which has been challenged on sufficiency grounds, we do so de novo; however, we must construe it liberally in favor of validity. *United States v. Bullock,* 914 F.2d 1413, 1414 (10th Cir.1990).

. . . .
(B) knowing that the transaction is designed in whole or in part—
(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. . . .

■ The indictment followed the statutory language and alleged the transactions in question involved a violation of 18 U.S.C. § 152, the bankruptcy fraud statute. Bankruptcy fraud is a specified unlawful activity for the purposes of the money laundering statute. *See, e.g., United States v. Gleave*, 786 F.Supp. 258 (W.D.N.Y.1992). Plainly the language of the indictment which followed the statutory language is sufficient. *See Bullock*, 914 F.2d at 1414. We hold the indictment sufficiently charges the Levines with using money from an illegal source—money diverted and concealed from the bankruptcy estate.

### B. *The Sufficiency of the Evidence:*

■ To sustain a conviction under the money laundering statute, the Government must plead and prove the defendant:

(1) knew the property involved in a financial transaction represented the proceeds of some unlawful activity;

(2) conducted or attempted to conduct a financial transaction which involved the proceeds of the unlawful activity;

(3) knew the transaction was designed in whole or part to conceal or disguise the nature, location, source, ownership or control of the proceeds from the unlawful activity.

■ A reading of the statute reveals its obvious purpose is to criminalize the use of funds from an illegitimate source in a legitimate transaction. *See United States v. Sanders*, 928 F.2d 940, 946 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 142, 116 L.Ed.2d 109 (1991). Thus the government must plead and prove the funds involved represented the proceeds of some form of unlawful activity. We review the evidence in the light most favorable to the government to determine whether sufficient evidence exists for a reasonable jury to find the Levines guilty beyond a reasonable doubt. *Ratchford*, 942 F.2d at 703.

It is important to note the three checks from the federal government were payable to Levines Home Furnishings, Inc. This was a separate corporate entity which the Levines owned and operated. This corporate entity filed the tax returns and was the entity to which the tax refunds were due. The fourth check, from the State of Colorado, was payable to three persons, Mr. and Mrs. Levine and their accountant, and was endorsed by the three owners. All four checks were deposited in the secret trust account established by the CPA and the monies therefrom found their way into the Levines' pockets.

■ Sufficient evidence exists to support the Levines' convictions. The evidence showed the Levines and their CPA agreed to delay the filing of the amended tax returns for which refunds were due in order to hide the existence of the four tax refunds from creditors. Clearly, the creditors or the bankruptcy estate were entitled to these monies; however, Mr. Levine repeatedly denied under oath the existence of any tax refund. The evidence is overwhelming that the Levines knowingly and fraudulently concealed these funds from their creditors and these monies were the property of the bankruptcy estate. The monies came from an unlawful source as they emanated from a bankruptcy fraud. We hold the record reflects sufficient evidence to support the Levines' money laundering convictions.

### III

### Mrs. Levine's Mail Fraud Conviction

Mrs. Levine was convicted on one count of mail fraud in violation of 18 U.S.C. § 1341[2] which requires the government to prove a scheme or artifice to defraud and the use of the mails to execute the scheme. *United States v. Taylor*, 832 F.2d 1187, 1192 (10th Cir.1987). Mrs. Levine argues that as the scheme had reached fruition, her conviction must be reversed.

---

**2.** The pertinent portion of 18 U.S.C. § 1341 provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, ... places in any post office ... any matter or thing whatever to be sent or delivered by the Postal Service" shall be guilty of a crime.

In essence, Mrs. Levine contends insufficient evidence exists to support her conviction. Thus, we review the evidence in the light most favorable to the government. The evidence is sufficient if a reasonable jury could find Mrs. Levine guilty beyond a reasonable doubt. *Ratchford,* 942 F.2d at 703.

The evidence supporting the mail fraud charge is uncontested. The Levines had hired a collection agent to collect the accounts receivable arising from the sale of the inventory. Mr. and Mrs. Levine devised a scheme to divert these monies from the secured creditors without their knowledge or consent. Mr. Levine directed the collector to send the funds to the secret law firm trust account as the Levines' attorneys "wanted to wash the money through" this account. The Levines' creditors later began efforts to locate diverted funds. Mrs. Levine then authored and sent a letter to the collection agent instructing him to send further proceeds from the accounts receivable to her at her residence. Thereafter Mrs. Levine received at least three checks from the collector representing the proceeds from the assigned accounts receivable and endorsed each.

■ Use of the mails need not be an essential component of the scheme as long as it is "incident to an essential part of the scheme." *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). The Supreme Court has reversed a mail fraud conviction where the scheme reached fruition prior to the use of the mails. *See Kann v. United States,* 323 U.S. 88, 94–95, 65 S.Ct. 148, 150–151, 89 L.Ed. 88 (1944).

■ Mrs. Levine argues the letter she sent to the collection agent was not incident to an essential part of the scheme. She claims the scheme to defraud creditors of accounts receivables had already reached fruition as earlier Mr. Levine had requested all the accounts receivable be forwarded to the law firm trust account. Therefore, Mrs. Levine claims her letter did not contribute to the scheme to defraud.

What Mrs. Levine overlooks is the fact the creditors were hot on their trail and had frozen their bank accounts. The only lawful course of action would have been to turn the accounts receivable directly over to the secured creditors. Instead, Mrs. Levine re-routed the proceeds from the accounts receivable from the law firm trust account to her home. Consequently, we hold sufficient evidence exists from which a jury could find beyond a reasonable doubt the letter was an essential part of the scheme. We affirm Mrs. Levine's mail fraud conviction.

## IV

### Admission of the Bankruptcy Judge's Opinion

The trial court received into evidence a ninety-four-page transcript of a hearing conducted before the bankruptcy court involving the question of whether or not Mrs. Levine should be required to turn over certain financial records. Earlier, Mrs. Levine had been deposed and refused to turn over certain records including those pertaining to the secret law firm trust account.

In this transcript, Mrs. Levine testified she had no records of previously undisclosed bank accounts; knew nothing about the monies in the employees' pension and profit sharing plans; deposited over $100,000 received from the kickback scheme with the liquidator into her attorneys' trust account and received a similar sum from the attorneys' trust account.

The transcript also shows Mrs. Levine's attorney testified the firm had a client's trust fund wherein the monies of all clients were comingled; produced the ledgers of the account which failed to show the receipt or payout of the $100,000; and admitted the receipt and payout of the $100,000 in funds.

This transcript also contained remarks of the bankruptcy judge made from the bench. The bankruptcy judge pointed out the obligations of a Chapter 7 debtor including the maintenance of minimal records and the duty to turn the records over. The bankruptcy judge found Mrs. Levine's failure to turn over the records was willful

and imposed sanctions of $2,000. The bankruptcy judge also had some comments concerning the actions of the attorneys, which we repeat verbatim:

We come then to the matters that pertain to the records concerning the trust account maintained at the law firm of Zimmerman and Schwartz.... And to the extent that counsel now asks that this Court enter an order mandating that the law firm produce those records, I think that's inappropriate. But it is an order for a hearing on whether this debtor has produced records which properly should be produced. And I share [the creditor's attorney's] incredulity about the nature of the accounting records of the law firm. There is one of the highest ethical obligations that the code of ethics places on counselors to maintain careful separate accounting records concerning trust funds entrusted to the firm by clients. To come to the court and say that there is no accounting record that evidences the receipt of in excess of $100,000.00, and the distribution of those same funds, strains my credibility beyond limits—or my belief in the credibility of that testimony beyond limits.

... [The debtor's attorney] is unable to tell us why there was no original account done.... The alternatives that present themselves to that are unsettling on either side; either it is indicative of a casual disregard by the firm of its ethical obligations to carefully account, segregate and maintain accounts for clients' trust funds, or it is an indication that the law firm was openly conspiring with the debtor to secret funds and records from the creditors and to properly account to the creditors of this estate for those funds. Either is a serious charge.

Now, there has been, in my view, a willful failing by this debtor to produce the books and records that she is obligated to produce....

....

... There is not evidence at this point of a willful conspiracy by the firm and the debtor to secret that information, although their record tracks very close to that.

The objections raised to this exhibit were somewhat nebulous. In pretrial the Levines took conflicting positions. Mr. Levine believed the statement to be exculpatory and Mrs. Levine reserved a right to object for unspecified reasons. At trial defense counsel objected to the relevancy of the exhibit while specifically conceding that parts of the transcript were relevant as to the issue of notice to Mrs. Levine of the impropriety of her counsel's actions. Counsel objected to the other findings of the bankruptcy court stating, "for example, ... that the debtor willfully withheld the production of the documents.... I just don't think that everything the Judge said at that time would be admissible." The district court allowed the exhibit.

The Levines now argue the bankruptcy court's comments were directed against the Levines, as well as the attorneys, and undercut the Levines' defense that they innocently relied upon the advice of their attorneys. The Levines assert the trial court abused its discretion in admitting this exhibit.

█ The decision to admit or exclude evidence is within the sound discretion of the trial court, and this court will not find an abuse of discretion unless we develop a definite and firm conviction that the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. *United States v. Morgan*, 936 F.2d 1561, 1571 (10th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992). Even then, we will not reverse unless the error affected a substantial right. Fed.R.Crim.P. 52.

█ We review relevancy questions utilizing a two step analysis. First we ask: is the evidence relevant under Fed.R.Evid. 401,[3] and, if so, should the evidence be

---

3. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401.

excluded as unfairly prejudicial under Fed. R.Evid. 403?[4]

■ The fact that portions of the exhibit are relevant was conceded and cannot be argued. The Levines' defense was that they acted in reliance upon advice of counsel. Consequently the bankruptcy court's remarks made in Mrs. Levine's presence went directly to the issue of whether Mrs. Levine believed her attorney's advice to be correct. In their brief to the court the Levines fail to identify any portion of this exhibit that they claim is not relevant. .

The next point of inquiry then is whether danger of unfair prejudice substantially outweighed the probative value of the exhibit. The Levines cite two separate cases involving the criminal convictions of two of their attorneys: *United States v. Zimmerman*, 943 F.2d 1204 (10th Cir.1991), and *United States v. Brown*, 943 F.2d 1246 (10th Cir.1991).

In *Zimmerman*, one of the Levines' attorneys was convicted of participating in the conspiracy to defraud. 943 F.2d at 1206. The bankruptcy court's remarks, and a letter from another bankruptcy judge referring the case to the United States Attorney for possible prosecution, were both received into evidence. *Id.* at 1211. We determined that notice to Mr. Zimmerman of the wrongdoing by the law firm was not an issue. *Id.* at 1212. In *Zimmerman*, the bankruptcy court's statements went only to the ultimate issue to be decided by the jury. *Id.* This raised the specter of jury confusion as to the proper weight to give to the bankruptcy judges' opinions. Therefore, we held the admission of these two statements to be reversible error. *Id.*

In *Brown* the defendant, an associate of the Levines' law firm, was convicted of four counts of conspiracy. 943 F.2d at 1248. We likewise held the introduction of the statements of the two bankruptcy judges contained conclusions regarding the

law firm's possible involvement in the conspiracy. *Id.* at 1256. We opined the admission of these conclusions was exactly the same as having the judges appear as expert witnesses and impermissibly giving their opinions and conclusions regarding a matter reserved for the jury. *Id.* Thus, we held the admission of these two statements to be reversible error. *Id.*

We distinguish both *Zimmerman* and *Brown*. Notice as to the accuracy of the attorneys' advice was not an issue in the trial of the two attorneys.[5] In the case before us the believability of the advice purportedly offered by the attorneys was very much an issue for the jury to decide. The trial court specifically instructed the jury the Levines could not be convicted if they were strictly following the advice of counsel "believing it to be correct." Therefore, the fact that the bankruptcy court specifically told the Levines their attorneys were possibly engaging in unethical conduct bears upon the Levines' alleged belief that their attorneys' conduct was correct.

Notably, the record reveals the Levines' attorneys paid the $2,000 in discovery sanctions imposed against Mrs. Levine at the hearing. Also, another attorney of the firm was called to testify the Levines were "flabbergasted" by the judge's comments and angry with their attorneys as a result of the bankruptcy judge's remarks. Thus, the remarks of the bankruptcy judge appear to benefit the Levines' defense theory that they were unaware their attorneys' conduct was illegal. Looking at the record as a whole, we cannot conclude the exhibit was unfairly prejudicial.

Even if we were to assume the jury may have considered the bankruptcy judge's remarks for the truth of the matter asserted,[6] we note overwhelming additional evidence existed that the Levines had conspired among themselves, with their business associates, relatives and CPA to con-

---

**4.** Fed.R.Evid. 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

**5.** Additionally, in *Zimmerman* the trial court gave an erroneous jury instruction and characterized the evidence against Mr. Zimmerman as tenuous and entirely circumstantial.

**6.** A reading of the bankruptcy judge's remarks belies this assumption. These remarks may be fairly read as saying the law firm was careless about its ethical obligations or it was conspiring

ceal their assets from their creditors. Thus, sufficient evidence existed independently of the bankruptcy court's remarks from which a jury could find the Levines guilty. While the Levines have not asked us to make a plain error analysis, we have done so and find no error.

We conclude the trial court did not abuse its discretion in admitting the bankruptcy court transcript into evidence.

## V

### Calculation of the Loss for Sentencing

At sentencing, the Levines contested the amount of the loss utilized in determining their offense level.[7] Under § 2F1.1 of the 1988 Sentencing Guidelines the base offense level for fraud was 6. The offense level was raised according to the amount of loss caused by fraud and deceit. The Levines contended loss between $200,000 and $500,000 resulting in an offense level increase to 13. The prosecution contended the loss was between $2 million and $5 million resulting in an offense level of 16. An offense level of 13 translates to a Guidelines imprisonment range of 18 to 24 months, whereas an offense level of 16 results in a 41 to 51 months sentencing range.

Following two sentencing hearings and extended argument, the trial court calculated the loss utilizing several different methods. In each case the court determined the loss to be approximately $4.6 million and thus utilized the $2 million to $5 million loss category. The court, utilizing concurrent sentences, sentenced the Levines to what amounted to a fifty-month sentence, which was within the Guidelines range established for losses found to be less than $5 million and more than $2 million. The Levines argue the court erred in its determination of the amount of the loss and

assert the true loss is approximately $450,-000.

■ We review the district court's factual findings regarding calculation of loss under a clearly erroneous standard. *United States v. Smith*, 951 F.2d 1164, 1166 (10th Cir.1991). However, determining which factors to consider in computing the amount of loss is a legal question subject to de novo review. *United States v. Lara*, 956 F.2d 994, 998 (10th Cir.1992).

■ The record on appeal contains more than sufficient evidence to establish the losses actually inflicted by the Levines' fraud to be in excess of $2 million. The parties stipulated the inventory and accounts receivable had a value of $1.7 million when the Levines declared their insolvency in July 1985. The evidence also shows the secured parties would have suffered no loss had they exercised their rights to the collateral at this time.[8] Further, the Levines embezzled in excess of $400,000 from the employees' pension and profit sharing plans and then concealed these monies from their creditors. These two amounts alone are sufficient to place the loss suffered into the over $2 million loss category. Thus, we conclude the record reveals sufficient facts to justify the trial court's use of this sentencing category. We need examine the record no further.

We hold the trial court's use of the more than $2 million but less than $5 million in losses to the victim category for the purpose of determining the base offense level was correct. Thus, we affirm.

## VI

### Organizer or Leader

After hearing the evidence, the sentencing court determined the Levines were or-

---

with Mrs. Levine to secret funds and records, however the judge clearly negated the sufficiency of the evidence to show a willful conspiracy by the firm and Mrs. Levine. The remarks did not bear on the many other objects of the conspiracy.

7. The parties and the court utilized the Sentencing Guidelines in effect in 1988 to avoid any complication arising from the law surrounding *ex post facto.*

8. Instead, the creditors loaned an additional $3 million to fund the liquidation sale. Because the Levines sold the furniture below cost at this sale, no money remained to pay the creditors. However, the Levines profited as they were receiving three per cent of the gross proceeds due to a secret agreement with the liquidator.

ganizers and assessed a four level upward adjustment on their offense level.

The Levines assert this finding is erroneous and argue the jury verdicts reflect the view that the Levines were guided by their attorneys and were unaware of wrongdoing. The Levines also argue the sentencing court failed to enter a specific finding regarding the identities of the participants. We find no merit to these contentions.

■ The sentencing court's determination that the defendant was an organizer is a factual finding subject to the clearly erroneous standard of review. *United States v. Walker*, 931 F.2d 631, 636 (10th Cir. 1991).

Section 3B1.1 of the Sentencing Guidelines provides for an increase in the offense level if the defendant was an organizer or leader of a criminal activity that involved five or more participants or that was otherwise extensive.

■ The record contains overwhelming evidence that the Levines organized the conspiracy. This evidence includes the Levines organizing the conspiracy; consulting two other attorneys before they hired their present attorneys; terminating their long term CPA; and introducing the liquidator to their attorneys.

The record also establishes the Levines as the leaders. Such evidence included Mrs. Levine directing the bookkeeper to give sale proceeds and accounts receivable proceeds directly to her so she could deposit the monies in the law firm trust account; instructing the collector to send monies from the accounts receivable to her home; contacting the pensions and profit plan broker with directions to convert the assets to cash; and establishing a secret personal bank account into which funds were diverted improperly.

Likewise, more than sufficient evidence exists to establish Mr. Levine's leadership role including Mr. Levine's instructing the collector to send the proceeds from the accounts receivable to the law firm; organizing Action Sales Group; diverting monies to secret bank accounts controlled by the Levines; and redeeming the pension and profit sharing plans' assets.

We note the Sentencing Guidelines provide an increase in the base offense level for being a leader of five or more. The record reflects twelve defendants were indicted in the conspiracy charge.[9] In the case before us, the record evidence is sufficient to support a finding that the Levines led five or more people. The trial court's identification of the five is not required when the record plainly shows the existence of these facts. *See, e.g., United States v. Maldonado–Campos*, 920 F.2d 714, 718 (10th Cir.1990).

Alternatively, the trial court easily could have found the Levines to be the leaders of an extensive criminal conspiracy. In *Morphew v. United States*, 909 F.2d 1143, 1145 (8th Cir.1990), the court concluded that an enterprise generating losses of $250,000 is extensive within the meaning of the Guidelines. In this case, actual losses amounted to over $2 million. The Levines' conspiracy and the many acts of fraud were prolonged and involved significant amounts of money diverted through a pattern of fraudulent acts. This is sufficient evidence to substantiate the finding of an extensive criminal conspiracy.

More than sufficient evidence exists in the record to support the trial court's finding that the Levines were organizers. Thus, we affirm the trial court's four-level increase based on the Levines' role in the offense.

## CONCLUSION

Sufficient evidence exists to support the bankruptcy fraud, money laundering and mail fraud convictions, and therefore we AFFIRM these convictions. We hold the trial court did not abuse its discretion in admitting certain remarks of the bankruptcy court into evidence. Furthermore, in enhancing the Levines' conviction the trial

---

**9.** These included: Edward Barash who assisted in the embezzlement of the pension plans; Stephen Forsey who was involved in Action Sales; Mr. Brown, Levine's attorney; Stanley Lansing, the liquidator; and Mr. Schlapfman, their CPA. The list could go on but it would serve no purpose as five persons whom the Levines employed are thus established.

court did not err in computing the amount of loss or in determining the Levines' role in the offense.  Thus, we AFFIRM the Levines' sentences.

The judgments and sentences of the District Court are AFFIRMED.